Good morning, Your Honors, and may it please the Court. Anthony Bornstein on behalf of the petitioner Kenyatta Alexander, and I would like to save two and a half minutes then for a rebuttal, if I may, please. Your Honors, under the Supreme Court's decision in Garner v. Jones, and this Court's decisions, particularly Brown v. Palmateer, 2003, the Court must examine the real-world practices or actual workings of the State Parole Board, in particular its policy statements, to discern whether or not there has been an ex post facto violation. In applying that analysis or directive in this case, examining the real-world practice of Oregon's parole boards prior to 1993 and then post amendment to the central statute here, it becomes clear that Mr. Kenyatta Alexander suffered an ex post facto violation. I'd like to start my analysis, if I may, with asking the Court to examine the key portions of the two statutes side by side. The pre-1993 statute, which is at the bottom of page 4 of our opening brief, and then the new statute in its key language at the bottom of page 5 leading to the top of page 6. The statute pre-1993 states that at the parole consideration hearing, if the condition, referring to the psychological condition, which rendered the person a dangerous offender at the original sentencing is absent or in remission, the board must then grant a release date in accordance with the applicable range or matrix, as we call it in Oregon. The new statute, juxtaposed, has deleted that entire component of a psychological condition. It instead focuses the inquiry on whether or not there is a finding of dangerousness. The reason for that reconfiguration of the decision-making function is because we now know from the agency's policy statements and its practices that the board desired more authority when it disagreed with the psychological evaluator's conclusions or diagnosis. So the board made it a board finding that is now part of a new criteria or analysis instead of just the determining factor of the psychologist's conclusions. It is very clear from the evidence in this case, the so-called internal policy statement or memorandum we call the Santos Memorandum, that institutional policy statement or memorandum authored by the board of parole then-chair, Danny Santos, who explained the differences in the operation of the two statutes. In my brief quoting the excerpt of record at pages ER 81 to 82, I set out the Santos Memorandum and how it explains that different statute. I actually asked the courts to examine a portion I didn't quote, which is the introduction of Chair Santos's memorandum that states how this is how the old statute worked, this is how the new framework works. And so we see again that there is a more relaxed and more advantageous standard, advantageous in terms of the board's ability to make the call rather than the psychologist. I have two responses to that, Your Honor. The same position was taken by the board in the case of Brown v. Palmateer in 2003 involving the companion statute, involving those prisoners who were not sentenced as dangerous offenders. The board said both statutes have been applied, the prisoners detained under both, and yet this court, by examining the psychological reports involved in that case, determined that the board actually, in reality, applied the new standard and found there had been an ex post facto violation. That is what I asked the court to do in this case, is that upon examining the two psychologists' evaluations, the court should determine that in reality the board applied the new standard. How do we know that? By examining the language used in Dr. Mowry's and Dr. Starr's evaluations. Dr. Mowry merely found characteristics and, quote, minor elements of the original psychological disorder that led to Mr. Alexander's designation as a dangerous offender. That's at ER, page 20. Dr. Starr's report… Yes, it's in that last, second-to-last complete sentence that begins about five lines from the bottom of his report, and it states that he continues to present minor elements of the behavioral and emotional problems which would lead to his incarceration and continues to be a minor danger to other individuals within society. So how does that advance your case? It advances the case because the dangerous offender statute required that sentencing enhancement statute under Oregon law required that a prisoner to be classified as a dangerous offender has to have a severe personality disorder. That's the language of that statute. The condition which the court originally found led to that severe personality disorder was an antisocial personality disorder. The doctor here, in conducting an evaluation prior to Mr. Alexander's release hearing, finds only minor elements… It doesn't say anything about severe. What it says is, at the parole, prisoners shall be given a release date in accordance with the applicable range and variation permitted if the condition which made the prisoner dangerous is absent. It doesn't say minor or in remission. Neither of those says minor. So is it your argument that remission with absent means if it's anything less than severe that that's the functional equivalent of absent? There's two ways to look at it. One, I think that that is the way in light of the fact that the original statute to get to qualify for enhancement means that there necessitates a severe personality disorder. That's 161.725. So you think that the logical reading of a release of a dangerous person, if it diminishes from the severe level, so they can't call it anymore quite severe, then he gets parole. So it only allows him to remain incarcerated. He's automatically entitled to parole if it diminishes at all from severe, either by total absence or remission. I think that is the proper reading of the statute. However, even here, if the court is not willing to make that finding as a matter of law, the equivocal nature of these two psychological reports, the tentative language, if you will, demonstrates that there is not even a firm diagnosis or sufficiently concrete diagnosis of an antisocial personality disorder. But Dr. Murray, who you cited in that same paragraph at Excerpts of Record 20, states, Mr. Alexander continues to manifest some signs of an antisocial personality disorder. Is it your position that unless he manifests all signs, he is automatically without the condition? I think the language of the doctor's report is important. And had the doctor made a concrete diagnosis of antisocial personality disorder. But he does. He says some signs of an antisocial personality disorder. You can't square that with no signs or he has no diagnosis of antisocial personality disorder. We have many conditions, both mental and physical, which have several symptoms and we allow the diagnosis of the disorder based on some but not all symptoms. Well, it would be too, I think, too insufficiently concrete criteria simply to say that some signs is enough, because that means if somebody had two signs of a number of different criteria, that would be enough. But the language that Judge Fischer was just quoting requires an absence of the condition. I don't submit that it doesn't require an absence of all of the possible signs. That would be far too extreme a requirement for a prisoner ever to attain release, a psychologist or the board. I agree. If there was just one sign and the psychiatrist would say this sign is insufficient for me to diagnose the condition, then you'd have a different situation. He doesn't say that. He says that he has some signs of an antisocial personality disorder. He doesn't say. But the disorder isn't there. Respectfully submit that the conclusion of the psychologist is equivocal. It seems to me that counsel, if you were correct in the regime, the practical world of parole would have required the psychologist to make an affirmative statement in the language of the statute. It is my professional opinion that this, since the psychologist under your analysis would be controlling, would be required to specifically state that it is absent or in remission. Instead, these two different doctors give qualified opinions, but they're noting improvement. They aren't noting absence or remission. And indeed, Dr. Starr. Yes, Your Honor. That's one of them. He says, in sum, it is this examiner's impression that Mr. Alexander continues to have many of the characteristics of the personality disorder that was associated with his sentencing as a dangerous offender in 1988, despite a recent pattern of improvement. Your reading is that that then is the functional equivalent of absence or remission because it has to be severe. And in light of the entirety of the language that the doctor uses, where he uses equivocal nature, it's equivocal language such as he may best be diagnosed as antisocial personality disorder. Well, he says it was agreed, however, that Mr. Alexander continued to suffer from the personality disorder that was associated with his crimes in the first place. OK, well, I think you have your point. Thank you, Your Honor. We'll take a look at the reports in the light that you've suggested. Thank you. Good morning, Your Honors. May it please the Court, Carolyn Alexander for Respondent. A couple of points I'd like to make about state law. Petitioners correct that the overriding issue for this Court is whether there's been an ex post facto violation by the Board. However, that determination hinges on the correct interpretation of state law, just as it did in Brown v. Palmatier. In Brown v. Palmatier, this Court considered a companion statute regarding parole release for non-dangerous offenders, 144-125. This particular statute involves parole release for dangerous offenders, 144-228. Those statutes are quite different in their statutory language. Petitioner continues to point to and challenge the amended language in 144-228, sub 1, sub b. However, he doesn't consider the statute in its entirety, in particular, 144-228, sub 2. The State Habeas Court specifically found that under 144-228, sub 2, the Board always had the authority to consider information outside the psychological evaluation in making its ultimate determination whether to set a parole consideration date for dangerous offenders. That statutory language is not present in 144-125. That is a key difference. It's a key difference in that the statute clearly says the Board had the authority to do what it did. Let me ask you to just clarify something for me. Because Mr. Alexander is a state prisoner, and we're talking about a state parole system, is the precise issue whether there's an objectively unreasonable application of the Supreme Court's ex post facto jurisprudence? Yes, Your Honor, I do think that's the issue. But doesn't that mean that we would have, by analogy to the standards in that Williams case, which wasn't ex post facto, but I think stated a deeper law, we would have to determine that the application by the state courts is objectively unreasonable? Correct, Your Honor, correct. And that inquiry necessarily requires an analysis of the state court's decision under state law. And Judge Tolman, in his dissent in Brown, talked about that issue. These two cases differ markedly in another way. In Brown, the majority found that Mr. Brown, in fact, didn't have the requisite diagnosis under state law. That, in fact, the requirements of state law were not met. Therefore, the board necessarily acted outside its authority in declining to release him on parole. Here we have a different case. The state court specifically found the board did have the authority under 144.228. There's no state case law that says, in fact, it didn't have the authority, or that a diagnosis was required, or some other foundation. All the statute requires, as the courts noted, is that the condition must still be present. Now, this record is much, much stronger than what Petitioner makes it out to be. If I can refer to Dr. Starr's evaluation, and this is on specifically an excerpt of Record 25, this is what Dr. Starr says. These two psychological evaluations were conducted a day apart, and it's clear from Dr. Starr's evaluation that the two psychologists consulted with each other about their conclusions. Dr. Starr says, right above the conclusions and recommendations section on ER 25, it was agreed, meaning with Dr. Mowry, however, that Mr. Alexander continued to suffer from the personality disorder that was associated with his crimes in the first place. That's where this court needs to look to make this determination. These two psychologists agreed that the antisocial personality, which Dr. Starr diagnosed Mr. Alexander with, was the same personality disorder that was present at the time he committed his crimes. Therefore, if the board was constrained by the psychological evaluation, which state law says it wasn't, but even if it was, this psychological evaluation says that antisocial personality is still present. The board could easily have based the same finding on the psychological evaluation. Well, but not according to counsel, because his reading of the statute is that that is an implicit finding of less than severe, and therefore it can only cut in favor of his release. What's your response to that? Well, the trial court, when it sentenced him as a dangerous offender, found that Petitioner, in fact, had a severe personality disorder. That's what allowed him to be incarcerated. Correct. And then what the statute says, 144-228, it says the condition that made the Petitioner or the offender prisoner dangerous must still be present. And his argument is that means it has to be severe. Well, I think it doesn't mean it has to be severe. Is there any Oregon authority constraining that? No, there is not, Your Honor. I think the statute is clear on its face that, in fact, the condition, to get a parole consideration date, the condition must be absent or in remission. I think it means absent or in remission. If there are some signs, and, again, this is a key distinction between this and the statutory scheme in Brown v. Palmateer, where there was required to be a diagnosis, therefore some signs of a diagnosis was not sufficient. Here, it doesn't require that. There's nothing that requires a diagnosis or anything less or more than some signs. And some signs or many of the characteristics appear to meet the statutory requirements. And, again, I would say that the statute is clear on its face, as the state habeas court found. But, nonetheless, even if that's correct, the trial court, the sentencing court, found he had a severe personality disorder, so sentenced him as a dangerous offender. Here, the psychologists are saying he has the same personality disorder. So there's nothing in the record to suggest that it's less severe than it was at the time. It's the same one. It seems from Dr. Starr's report that he seems to be getting along better in jail, but that he continues to believe that his crime was wrong because he was being unfaithful in his marriage. Correct. And I think, Your Honor, that's right, that that drove Dr. Starr's evaluation considerably, that Petitioner still was not taking responsibility for his crimes. He didn't even recognize, in fact, that they were crimes. In fact, in one point, in the background, in the psychological evaluation, again, I believe this was both in Dr. Starr's and Dr. Mowery's, or at least Dr. Starr's, Mr. Alexander was saying, telling the examiners that he didn't even realize he committed a crime until he was arrested. And this was a forcible rape as well as a sodomy. He didn't even mention the sodomy. He thought it was consensual until he was actually arrested. The psychologists appear to believe that, in fact, that had not changed. One thing also I would like to mention as well, and that's regarding the Santos Memorandum. As the states argued in the red brief, that memorandum is not properly before the court because under 2254E2, it was not developed in state court. Petitioner used no due diligence in developing that particular evidence in state court. But nonetheless, that memorandum was written in 1993. Petitioner committed his crimes in 1988. That memorandum is no evidence of how the board interpreted its authority in 1988. It may be that the board misconstrued its authority in 1993. That says nothing about how it was construing its authority in 1988, which is the crucial date for the analysis of the ex post facto claim. One additional thing as well that I would like to clarify, and that's a crucial difference again between 144.228 and 144.125. If this court were to decide that Mr. Alexander's ex post facto claim has merit, he isn't entitled to release. Under the dangerous offender statutory scheme and the parole board statutory scheme that relates to that, he's entitled to a parole consideration date. At that date, the board then considers other factors in setting a parole release date, such as institutional misconduct, for example. So he's not entitled to release. He may be entitled, if this court finds in his favor, for a remand to the board to set a consideration date. But again, dangerous offenders are treated very differently under Oregon's statutory scheme than non-dangerous offenders. I probably knew this earlier, but I've forgotten it now. I don't want to know if it's not in the record. But if the record tells me this, which it's probably somewhere there, how old is Mr. Alexander now, and how long has he been in prison? He has been in prison since he was incarcerated since the crimes in 1988, so he's not been released. His age, I believe it is in the record. I'm not sure I can find it so quickly. I believe he's younger than 50, however, and maybe counsel can correct me if I'm wrong. If there are no further questions, thank you. Just a few points if I may, Your Honors. The excerpt of record, page 21, notes that his birthday was in September of 1961. In terms of how long he's been in prison, it's been over 15 years since the incarceration in 1988, and one of the prison sheets of information notes that he had 154 days in credit for time served. 17 years he's been in prison? Yes, Your Honor. And then in terms of the release date, I would point to two parts of the record on page, Excerpt of record 27, which is the face sheet to the board action form, it notes a matrix range of 88 to 112, and then in the petition for a writ of habeas corpus, the petitioner noted that in August of 1989, the Board of Parole conducted an initial prison release term in his case and set the parole release date for July 24, 1996, following 100 months. So I submit that he should, after 17 years, be out if the court does find an ex post facto violation. One final point. How do you address this? At least as I understand Williams, even if we thought that there was an ex post facto violation, if we had been sitting on direct appeal, we can't give relief unless it's at the level of an objectively unreasonable determination by the state court, right?  The Supreme Court has set the standards for when it would be ex post facto here on the elements that you've been discussing, but we'd have to determine that the state appellate court objectively unreasonably applied those standards. That's absolutely correct, Your Honor. Two years ago, this very court in Brown v. Palmatier applying the companion parole statute and applying the objectively unreasonable standard in 2254 D1 found that the Oregon Parole Board committed an ex post facto violation, even though there was not a particular case involving this type of statute. I believe the court cited Weaver v. Graham, I believe Collins v. Youngblood, and other cases expounding the ex post facto principle and applied them to that case and found an ex post facto violation. In conclusion, I would submit that a similar analysis would lead to a finding of ex post facto violation and standard for relief under the ADPA in this case. Thank you. And that case was equally well argued. As I noted, the counsel in Brown were the same counsel before us today. Yes, Your Honor. Thank you. Counsel, thank you very much. We appreciate your good arguments on both sides, and we stand adjourned.
judges: Fisher, Gould, Bea